No. 9267.

JOHN CROSSLEY & SONS, LIMITED, VS. THE COMMISSIONERS OF THE LOUISIANA SAVINGS BANK AND SAFE DEPOSIT COMPANY.

Conventional interest cannot be recovered without proof of a contract to pay such. Legal interest only can be allowed in the absence of such contract.

A claim to the ownership of securities pledged, cannot be recognized when it is apparent that the pledgor did not transfer them and the [pretended conveyance was made by one who never had any title to the ownership thereof, to the knowledge of the pledgee.

Crossley & Sons vs. Louisiana Savings Bank.

The value of stock cannot be recovered as the price thereof, where it is not shown that a contract to sell and purchase was entered into directly, or by an authorized agent.

The transfer of stock by a banking institution to one of its creditors, in part liquidation of his indisputable claim against it, does not justify recovery of the price value of the stock from one to whom such creditor subsequently conveyed it, in settlement of his indebtedness.

If the original transaction be null, because *ultra vires*, it is not enforceable against the transferree or his assigns.

The giving of a letter of credit to a bank to be used solely in case of an emergency, or of a financial panic and if necessary to maintain and restore the bank, does not authorize the use of it, unless in the cases stipulated

Recalling such letter and declining to honor drafts under it, where the amount, if paid, could not possibly have saved the bank, gives no right to recover the same. Such recalling does not forfeit the right of preference which the pledgees have on the securities in hand.

APPEAL from the Civil District Court for the Parish of Orleans. *Lazarus*, J.

---

*Miller & Finney* and *Blanc & Butler* for Plaintiffs and Appellants :

I

1. Plaintiffs are entitled to judgment against defendants for $167,510 36, with interest at five per cent per annum, from October 30, 1875, until paid, on $45,485 36; like interest from April 15, 1879, on $24,225 00; like interest from April 21, 1879, on $24.250 00; like interest from May 5, 1879, on $49,250 00, and like interest on $24,000 00, from June 21, 1879, until paid for money loaned.

2. Recognizing them as pledgees of the $214,208 80 of drainage warrants, and ordering the sale of the same, to satisfy the amount for which they were pledged.

3. Decreeing them to be the owners of $120,000 of drainage warrants, turned over to them by E. C. Palmer, in part settlement of his indebtedness to them.

4. Commanding defendants to redeem and turn over to plaintiffs, as stipulated in the letter of credit, the drainage warrants pledged to the Fourth National Bank of New York, and to other parties, to be sold to satisfy the amount due plaintiffs under the aforesaid loan.

5. Rejecting the demand in reconvention with all costs.

II.

The demand in reconvention for $350,000 00 on account of the conversion of the bank's indebtedness to Palmer to that extent, into 3500 shares of its capital stock, should be rejected.

1. The claim is barred by the lapse of time, more than five years having gone by before the institution of any proceedings for its enforcement. C. C. Art. 3542; 3 Rob. 318; 4 Rob. 8; 5 Rob. 83; 10 Rob. 425; 11 Rob. 302; 3 Ann. 328.

2. Plaintiffs acquired the stock from Palmer as full paid stock, in perfect good faith and for value, and had no transaction with the bank in relation thereto.

3. Palmer's acquisition of the stock was made for a valuable consideration in good faith, and in a way and manner which made the transaction equivalent to a payment in cash for the stock ; under such circumstances his conditional subscription was valid ; but, if it was invalid. the bank commissioners are estopped from questioning its validity.

    (a) Authority sustaining the conversion. Louisiana cases : 23 Ann. 732; 27 Ann 118; 35 Ann. 276. Other State cases: 9 Ala. N. S., Cooper vs. Frederick; 16 B, Monroe 6, Wright vs. Shelby. R. R. Co (Ky.) ; 41 Miss. 188 ; 15 John's (N.Y.) 555 ; 2 Sandf. (N.Y.) 39 ; 1 Casey, (Pa.) 156 ; 4 Casey, (Pa.) 327 ; 27 Pa. State, 261 ; 9 Watts, 458 ; 41 Pa. State.

Crossley & Sons vs. Louisiana Savings Bank.

54.; 6 Ohio, 119; 1 Ohio, 22, 328; Thrasher vs. Pike R. R. Co., 25 Ill.; 38 Ill., 215; 39 Maine, 587; 63 Maine, 480; 44 Cal. 492; 43 Com. 86; 4 Greene. (Iowa) 42; 10 Ind. 539; 2 Duval, (Ky.) 242; 12 Wis. 512. Federal Court cases; 1 Dillon, 174; 16 Wal. 395; 17 Wal. 108; 22 Wal. 136. English cases: Spargo's case, VIII, Chancery Appeals, 407; Ferrao's case, IX, Chancery Appeals, 355; Adamson's case, Law Reports. Vol. XVIII, p. 670. Carling's case, Law Reports, 1 Chancery Div. p. 115; Anderson's case, Law Reports, 1 Chancery Div. p. 75.

(b) Authorities in support of plea of estoppel. Herman on Estoppel, p. 337, and cases there cited; 5 Rob. 523; 1 Ann. 11; 4 Ann. 263; 5 Ann. 368, 108; 6 Ann. 276. 349; 9 Ann. 528; 12 Ann. 473; 15 Ann. 531; 28 Ann. 107; 32 New Hampshire, 295; Bigelow on Estoppel, 464; Dillon on Municipal Corporations, 375, 383, 385, 398; 23 Howard, 400; 2 Black, 722; 13 Wal. 297; 3 Otto, 13.

4. If the conversion was invalid and the commissioners are not estopped from questioning its validity, the only effect of that state of things is to strike the transaction with nullity; it does not create a new contract, nor authorize the court to hold plaintiffs to the performance of an agreement which they never assented to, and which, had it been proposed to plaintiffs, would have been rejected. C. C. Articles 1766, 1798. 1800, 1803; 6 La. 218; 5 Ann. 4; 11 Ann. 649; 15 Ann 521; 11 Johns, (N. Y.) 100; 9 Johns, (N. Y.) 218; 8 Sargt. and R. (Pa.) 219; see also English cases above cited.

5. The attempts to compel plaintiffs to pay again for the stock, is not only illegal but, in view of their unparalleled liberality to the bank, and of the great losses they have been occasioned thereby, it is to say the very least of it, most inequitable and unjust.

The demand of the Bank Commissioners for the unpaid portion of the letter of credit amounting, as they allege, to the sum of $78,712 50, should also be refused.

1. The letter of credit was given under express condition that it should not be drawn against except to sustain the bank in a real emergency or financial panic; and with the understanding that the cash arising from the loan of £40,000, of which the letter formed a part, should be used and applied by the bank to the redemption of certain pledged drainage warrants which, when so redeemed, were to be turned over to plaintiffs; both of these conditions were shamefully violated by the directors of the Louisiana Savings Bank; and plaintiffs were, therefore, fully justified in recalling their letter of credit, and in refusing to honor any further drafts under it.

2. The bank was in such a state of collapse when plaintiffs withdrew their letter of credit, that it could not possibly have been sustained by further advances: and, as the object of the letter had thus failed, plaintiffs were at liberty to recall it.

3. As the bank paid nothing for the letter of credit, and failed to redeem and turn over any of the securities it had promised; plaintiffs, for such reasons, had a perfect right to cancel their letter.

4. As soon as Edward Crossley, acting for the plaintiffs, had given their letter of credit, and had advanced $100,000 in cash, to the bank. he took his departure for England; his back was hardly turned on New Orleans when Conery and other Directors commenced withdrawing their deposits and, in less than (30) days, they, in that way, had unlawfully, and in bad faith towards plaintiffs, appropriated out of the cash thus put into the bank by plaintiffs, upwards of $100,000; notwithstanding those directors had promised plaintiffs that they would do all in their power to maintain the bank, if plaintiffs would only lend the bank the $100,000 in cash, and give the aforesaid letter of credit. Such conduct on the part of the directors, wholly exonerate plaintiffs, and amply justified them in recalling the letter of credit.

## W. S. Benedict for Defendants and Appellees :

### I.

As to the deposit in November, 1874: The depositary owes no interest for the money placed in his hands, except from the day he became a defaulter. C. C. 2948, (2919) 11 Ann. 199 and 200.

### II.

As to the drainage warrants claimed through manual delivery of E. C. Palmer: *Nemo plus juris ad alienum transferre protesi, quam ipse habet.* Coke, Litt., 3 9; 2 Kent Comm., 324; Ventress & Smith. 10 Peters. 161-175.

"A debtor may give in pledge whatever belongs to him, but with regard to those things in which he has an ownership which may be diverted, or which is subjected to encumbrances, he cannot confer on a creditor by a pledge any further right than he had himself. C. C., 3142.

"The president was the trustee of the bank by law, and of the warrants by order of the bank.

"Like a director he is absolutely prohibited from the performance of those questionable acts wherein his conduct may be wholly free from blame; but, where the bias of self-interest is strong, and may influence him even without his own recognition of the fact. The law, therefore, has with wholesome care declared that it is the duty of a director, resulting from the employment itself, not to acquire any interest in any matter adverse to that of the bank so long as he remains in office. Morse on Banks and Banking, 2d Edition, p. 114.

"If the act is open to suspicion, he will, like a trustee, be held to have violated his duty, which is not to strive to do questionable things conscientiously, but wholly to refrain from all actions or intermedling in them of what nature soever." Page 115, Id.

### III.

As to liability to pay $350,000 for stock.

#### AGENCY.

1. "The broker or intermediary is he who is employed to negotiate a matter between two parties and who, for that reason, is considered as the mandatory of both. C. C. 3016.

"The obligations of a broker are similar to those of an ordinary mandatory with this difference; that his engagement is double, and requires that he should observe the same fidelity towards all parties and not favor one more than another. C. C. 3017.

"An agency may be created by the express words or acts of the principal, or it may be implied from his conduct and acquiescence; so also the nature and extent of the authority of an agent may be expressly given by a solemn or an unsolemn instrument, or it may be implied or inferred from circumstances. Story on Agency, Sec. 45, 8th ed.

"The nature and extent of authority in authorizing another to assume the apparent ownership, or right of disposing of property in the ordinary course of trade, will be presumed, in such case. Strangers look only to the acts of the parties, and are not to be affected by mere private communications which pass between the principal and the agent. Sec. 93.

#### LIABILITY OF SHAREHOLDERS.

"The obligation of payment upon a subscription of shares in a capital stock of a banking corporation is created and perfected by the act itself of subscription. The shifts to which shareholders who have only paid a portion of the par value of their shares, have resorted to in order to avoid further payments after the corporation has proved unsuccessful, are very numerous. But they have uniformly met with well-deserved failure, at least so long as *bona fide* debts of the bank were outstanding. Morse on Banks and Banking, 2d ed. p. 488.

"The doctrine that the stock subscriptions are in the nature of a trust fund for the payment of corporate liabilities is well established. Subscribers cannot avail themselves of the statute of limitation in bar of the claims of creditors to have full payment made. The collection in due season by a corporation, is a matter lying wholly between itself and the subscribers. Page 490.

"A subscription for bank stock cannot be diminished after it is once made. So soon as it is legally completed, it is an obligation from which even the directors cannot grant the

subscriber any absolution. either for the whole or for any part, which will avail him as against persons who were creditors of the corporation prior to the diminution.  P. 491.

"If persons have suffered their names to be entered as directors, though by virtue of some arrangement with the bank by which it is agreed that they shall only assume this appearance without making any payments. or becoming stockholders in fact, still they will be held to all liabilities of ordinary or regular owners for the benefit of creditors. P. 496.

"Where one is a creditor. as well as a stockholder, he cannot avail himself of the deb owing to him by the bank, by way of set off to diminish his contributory share.  His liability as a shareholder for the benefit of creditors must be distinct from his character as a simple contract debtor of the bank upon ordinary business transactions."  P. 500 .

" The liability of each stockholder is precisely for the ratable proportion of the sum total of the indebtedness of the bank."  P. 503.

"One who agrees to take and fill a share in the capital stock of a corporation, is liable to pay all assessments legally made on that share."  Buckfield Branch R. R Co. vs. Irish, 39 Me. 44 ; S. P  Fry vs. Lexington, etc. R. R. Co. 2 Metc. (Ky.) 314; City Hotel vs. Dickinson, 6 Gray, (Mass.) 586 ;  Buffalo, etc. R. R. Co. vs. Dudley, 14 N. Y. (4 Kern), 336 ; Dayton vs. Borst, 37 N. Y. 435;  Northern R. R. Co. vs. Miller, 10 Barb. (N. Y.) 260 ; Fort Edward, etc. Plank Road Co. vs. Payne, 17 Id. 567;  Troy, etc. R. R. Co. vs. Tibbetts, 78 Id. 298; Merrimac Mining Co. vs. Levy, 54 Pa. St. 227.

"A subscription to the stock of a railroad company creates a debt against the subscriber from which he cannot relieve himself by an assignment or transfer, made without the sanction of the directors."  Graff vs. Pittsburg & Steubenville R. R. Co,, 31 Pa. St. 489.

"If a party admits himself to be a subscriber, and on the faith of such admission others have acted for his benefit, he will be estopped from subsequently denying that he did in fact subscribe."  Id.

"A subscription for shares was made by A for and in the name of B.  Held. that B by accepting the office of director to which he was not eligible, if not a stockholder, had recognized the validity of the subscription." Penobscot R. R. Co. vs. Dummer, 40 Me. 172.

"Agreements secretly made with sundry subscribers for stock in a company, that their subscriptions shall be merely colorable, or dischargable in property worth less than the face amount of such subscriptions, are a fraud upon other subscribers, and the written subscriptions should be enforced without regard to them." Downey vs. White, 12 Wis., 176.

"A bank was fraudulently got up, under a lawful charter, by parties who induced the defendant to subscribe for a portion of the stock, representing to him that his subscription would be merely nominal, and that he would not be required to pay for the stock. The bank was organized, issued a large amount of bills, and soon after failed and went into the hands of receivers for the benefit of its creditors.  In a suit brought by the receivers in the name of the bank against the defendant, upon his subscription, *held*, that he could not avail himself, in defense of the fraudulent character of the bank, or of the misrepresentations under which he had been induced to subscribe for the stock. He, with his associates, constituted the bank, and he therefore shared with them in the fraud of the bank on the public." Litchfield Bank vs. Church, 29 Conn., 137.

"A discharge from a stock subscription on the ground of fraud cannot be obtained by one who was himself a party to the fraud."  Southern Plank Road Co. vs. Hixon, 5 Ind. 166.

"Specie, or its equivalent, current bills of specie-paying banks, can only be received in payment of the sum required to be paid at the time of subscribing the stock."  Crocker vs. Crane, 21 Wend. (N. Y.) 211;  S. P. People vs. Troy House Co., 44 Barb. (N. Y.) 625 ;  Neuse River, etc. Co. vs. Newbern, 7 Jones (N. C.) L. 275;  Henry vs. Vermilion, etc. Co., 17 Ohio 187.

"To make one an owner of stock in a corporation, it is not necessary that a certificate should

have been issued, or that the facts should appear on the books of the corporation. It may be proved by parol." Chaffins vs. Cummings, 37 Mo. 76.

"Where stock is taken, and the property turned in of less value than the price at which it was turned in, the stockholder may be charged with the full amount without any allegation of fraud." Thompson on Stockholders, sec. 127; Boynton vs. Hatch, 47 N. Y. 225; Tallmadge vs. Fishkill Iron Co., 4 Barb. 382.

"Money, or money's worth, must be actually paid." Thompson, sec. 130.

"The obligation of actual payment is created." Angell & Ames on Corporations, sec. 519.

We beg to refer the Court to the case of Griswold vs. Seligman, reported in Central Law Journal, November 26, 1880, page 432. The Supreme Court of Missouri, in that case, says:

"The relation of stockholders may be created not only by the usual formalities of a subscription and the acceptance of stock, but other acts are, in contemplation of law, the legal equivalents of those just mentioned. That is to say, conduct on the part of the person sought to be charged is of itself sufficient to accomplish all that could be accomplished by the rigid observance of those formalities usually attendant on becoming a stockholder. 'A party cannot by his own conduct change his liability at pleasure.' The beneficial use of stock will also render the person so using it liable as a stockholder."

The Supreme Court of the United States, 91 U. S., p. 45, in the case of Upton vs. Tribilcock, says:

"The original holder of stock in a corporation is liable for unpaid instalments of stock, without an express promise to pay them; and a contract between a corporation or its agents and him, limiting his liability therefor, is void both as to the creditors of the company and its assignee in bankruptcy.

"Representations by the agent of a corporation as to the non-assessability of its stock, beyond a certain percentage of its value, constitute no defense to an action against the holder of the stock to enforce payment of the entire amount subscribed. where he has failed to use due diligence to ascertain the truth or falsity of such representation. The acceptance and holding of a certificate of shares in an incorporation, makes the holder liable to the responsibilities of a shareholder. The idea that the capital of a corporation is a foot ball to be thrown into the markets for the purpose of speculation, that its value may be elevated or depressed to advance the interests of its managers, is a modern and wicked invention. Equally unsound is the opinion that the obligation of a subscriber to pay his subscription may be released or surrendered to him by the trustees of the company. This has been often attempted, but never successfully. The capital paid in and promised to be paid in, is a fund which the trustees cannot squander or give away. They are bound to call in what is unpaid, and carefully to husband it when received."

In the case of Sawyer vs. Upton, 91 U. S., p. 56, it is held by the same court:

"That the capital stock of an incorporated company is a fund set apart for the payment of its debts. A resolution or agreement that no further call shall be made is void as to creditors. An agreement that a stockholder may pay in any other medium than money is also void, as a fraud upon the other stockholders and upon the creditors as well. The capital stock is publicly pledged to those who deal with the corporation for their security. Unpaid stock is as much a part of this pledge, and as much a part of the assets of the company as the cash which has been paid in upon it. Creditors have the same right to look to it as to anything else and the same right to insist upon its payment as upon the payment of any other debt due to the company. As regards creditors there is no distinction between such a demand and any other asset which may form a part of the property and effects of the corporation."

In the case of Webster vs. Upton, 91 U. S., p. 65, the court says:

"If the law implies a promise by the original holders or subscribers to pay the full par

value when it may be called, it follows that an assignee of the stock, when he has come into privity with the company by having stock transferred to him on the company's books, is equally liable. The same reasons exists for implying a promise by him as exist for raising up a promise by his assignor."

In the case of Hawley vs. Upton, 102 U. S., p. 314, decided by the Supreme Court, the Court holds:

"It cannot be doubted that one who has become bound as a subscriber to the capital stock of a corporation, must pay his subscription if required to meet the obligations of the corporation. All that need be done, so far as the creditors are concerned, is that the subscriber shall have bound himself to become a contributor to the fund which the capital stock of the corporation represents. If such an obligation exists, the court can enforce the contribution when required. After having bound himself to contribute, he cannot be discharged from the obligation he 'has assumed until the contribution has actually been made, or the obligation in some lawful way extinguished."

In Pullman vs. Upton, 96 U. S., 328, the foregoing doctrines are stated: Griswold vs. Seligman, Supreme Court of Missouri, November, 1880, Central Law Journal, p. 432, vol. 2, No. 22.

1.  "One who accepts and holds certificates for unpaid shares of stock in a corporation, and votes such shares at annual elections, is estopped from denying his liability as a stockholder to a corporation or its creditors; although such shares were issued to him under an agreement in writing that they were to be held in trust, or as a security only, and were not subscribed for on the books of the company or otherwise in the usual manner of making such subscriptions. One may be constituted a stockholder by his conduct as effectually as by the rigid observance of the usual formalities in making subscriptions.

2.  "Parol evidence is not admissible to show that the stock was voted under an arrangement with the company, made outside of the written contract for a specific purpose, to the effect that such holder should have the privilege of voting the stock without attendant liability.

3.  "In a proceeding to enforce such liability, it is unnecessary to show that the creditor became such subsequently to the acquisition of the stock by the defendant, or in consequence thereof, or altered his condition by giving credit to the company on the faith of defendant being a stockholder. Under the Missouri statute the liability attaches to the holder of the stock at the date of the execution.

4.  "Parties dealing with a corporation are not affected with notice of entries made upon its corporate books, limiting the liability of holders of unpaid stock.

"The creditors of the company have this whole stock as a security for any judgment against them, and the company cannot, by any act of theirs, liberate any of its stockholders from their obligations to pay the remainder of the price of their shares to the prejudice of the creditors." 10 Rob. 440.

To the same effect is the case of Cucullu vs. Union Insurance Company, 2 Rob. 571.

"One who assigns an agreement to take stock in an incorporated company, thereby promises to pay the full amount of every share thus subscribed for, and an action will lie to recover it, either for the purpose of carrying on the business of the company or of paying its debts. A stockholder will not be allowed to throw the loss upon the creditors, either by refusing to pay for their stock, or by forfeiting it, or by dissolving the corporation by non-user or otherwise. As to the responsibility of the stockholders towards the creditors, we have not a shadow of doubt."

In County of Morgan vs. Allen, Sup. Court, U. S., October term 1880, the court says: 103 U. S. p. 508.

"In Sawyer vs. Hoag, 17, Wall. 621, we had occasion to consider the question whether the creditors of an insolvent corporation were at liberty to assail a transaction between it.

and one of its debtors, whereby the latter's subscription of stock was withdrawn so far as general creditors were concerned, from the assets of the corporation. In that case we declared the doctrine to be well established that the capital stock of a corporation, especially its unpaid subscriptions, constituted a trust fund for the benefit of the general creditors of the corporation, and that the governing officers of a corporation could not, by agreement or other transaction with the stockholders, release the latter from his obligation to pay to the prejudice of its creditors. except by fair and honest dealing and for a valuable consideration. In the subsequent case of Sawyer vs Upton, assignee, 91 U. S . 60 we had occasion to consider the same question and there said:

"The capital stock of an incorporated company is a fund set apart for the payment of its debts. It is a substitute for the personal liability which subsists in private co-partnerships.

"When debts are incurred a contract arises with the creditors that it shall not be withdrawn or applied otherwise than upon their demand. until such demands are satisfied. The creditors have a lien upon it in equity. If diverted, they may follow it as far as it can be traced. and subject it to the payment of their claims. except as against holders who have taken it *bona fide* for a valuable consideration and without notice.

"It is publicly pledged to those who deal with the corporation for their security.

"Unpaid stock is as much a part of this pledge, and as much a part of the assets of the company, as the cash which has been paid in upon it. Creditors have the same right to look to it as anything else. and the same right to insist upon its payment as the payment of any other debt due the company. As regards creditors, there is no distinction between such a demand and any other assets which may form a part of the property and effects of the corporation." Upton vs. Tribilcock, 91 U. S. 45; Webster vs. Upton, Ib. 65; Hatch vs. Dana, 100 U. S. 210.

In no court have these doctrines been more distinctly approved than in the Supreme Court of Illinois, when considering the liability of "The county of Morgan to creditors of the Illinois River Railroad Company. arising out of these identical bonds, Morgan Co. vs. Thomas, 76 Ill. 141."

Plaintiffs contend that the case of Burk vs. Smith, 16 Wal., 395, establishes a different doctrine. It does not, for the court in that case specially lays down the general rules which we have cited, and says:

"And it must also be conceded that if the company has. in fraud of its creditors, released subscribers to its stock from the payment of their subscriptions. the release is inoperative to protect those subscribers against claims of the creditors. * * * Accordingly, it has been settled by very numerous decisions that the directors of a company are incompetent to release an original subscriber to its capital stock, or to make any arrangement with him by which the company, its creditors, or the State shall lose any of the benefit of his subscription. Every such arrangement is regarded in equity not merely as *ultra vires*, but as a fraud upon the other stockholders. upon the public, and upon the creditors of the company."

The case of Cooper vs Frederick, 9 Ala., new series, does not touch the question at issue, because it was a question between the company and the stockholder, the company being in good standing and no question as to creditors arising. It was in the nature of a diminution of the capital stock.

It is contended that the case of the Weschester Railroad Company vs. Hickman, 4 Casey Penn. 327, which states that a corporation had the right to accept payment of stock in labor or material, if carried out in good faith, justifies this bank in taking a check upon itself, which was not a good check, and totally worthless, as a full compliance with the law, and that it had the effect of releasing the shareholders from any payment of such stock thereafter. at the expense of the creditors. This authority does not establish that principle.

*Thos. J. Semmes* on the same side:

1.  Misrepresentations made by the officers or directors of a corporation are misrepresenta-
    tions of the corporation itself and of its share-holders. Litchfield Bank vs Church, 29
    Conn. 137.

2.  Capital of a corporation is the stake held out to the public, upon the faith of which it
    obtains credit. Thompson's Stockholders, sec. 11, 91 U. S. 57.

3.  A corporation cannot accept in payment of its stock any property which it is not author-
    ized to deal in. 4 Ch. App. 779; 27 Ann. 118. Even then the arrangement must be em-
    bodied in the articles of association, as in Pell's case. 5 Ch. App. 11, 346; 6 Ch. App.
    48; L R. 15 Eq. 411.

4.  Subscriber for stock cannot set off his liability for stock against a debt due to him by
    the corporation. 8 Ch. App. 262; 21 Ch. Div. 519; 7 Wall. 409; 17 Wall. 421.

5.  The power to create preferred stock must be employed solely for the purpose of obtain-
    ing capital. L. R. 20 Eq. 64; 4 Kay & John, 1; Green's Ultra Vires (Brice). 145.

6.  Where stock is issued on an agreement which is not lawful, the party receiving the
    stock can be made to pay for it, and the agreement will be disregarded. 1 DeGex [&
    Jones, 377; 1 Ch. Div. 127; 17 Ohio, 187; 20 Ohio, 199.

7.  Where misrepresentations of a stockholder of a corporation induce third persons to
    become creditors of an insolvent corporation, such stockholder being a creditor will not
    be allowed to participate in the assets of the corporation as a creditor, until the injured
    third persons are satisfied. Colt vs. Woolaston, 2 Pere Williams, 155.

The opinion of the Court was delivered by

BERMUDEZ, C. J. It is essential for a proper understanding of this controversy that, at the threshold, a very concise statement be made of the most glaring facts which the trial has indisputably developed, as also of the pleadings which present the issues submitted. Otherwise, the mind left guideless in the labyrinth before it, could never see its way through.

Those facts are:

John Crossley & Sons had extensive financial relations with one E. C. Palmer and the Louisiana Savings Bank and Safe Deposit Company.

They deposited with the institution $50,000, for which certificates were issued.

They made money advances to the bank for $100,000 and subsequently granted to it a letter of credit for as much (£20,000) to be used only under certain terms and restrictions, receiving as collateral security for advances made and to be made, certain drainage warrants, in the possession of the bank, and besides, generally all other warrants belonging to it, and which had been pledged to other parties, but which were to be redeemed and then handed over.

Under this letter the bank drew some $22,000.

Palmer was the president of the concern and its creditor for advances and loans really made, figuring to his credit on the books, for upwards of $400,000.

New or additional stock, to the extent of 3500 shares, having been authorized to be issued, it was agreed (as there was no disposition for outsiders to take any of it) between the bank, Palmer and the Crossleys, who appear to have had some title to the credit in favor of Palmer, that this indebtedness would be converted into the stock, in Palmer's name. Subsequently, with plaintiffs' assent, this stock was placed, part in the name of a number of the directors, part otherwise; some remaining in Palmer's name.

On the brink of the bank's failure and destruction, but before it had been used the letter of credit, as far as not made available, was recalled by the Crossleys.

Palmer had had extensive dealings with one VanNordan, who had under his control the drainage of the city, who became largely indebted to Palmer and the bank, and who, in a transaction between him and the city, was required, in order to give a clear title to the corporation, to turn over to Palmer a large amount of drainage warrants received from the city as the consideration of the contract between them; those warrants being important factors in this litigation.

The bank went into bankruptcy. Its affairs and business are now in process of liquidation.

The plaintiffs bring this action to recover the balance due on the certificates of deposit, the advances made aggregating, they say, $167,510 36. They further claim conventional and legal interest on different portions of this amount.

The plaintiffs aver rights of ownership to the drainage warrants in their possession and to others, of the total face value of $516,208; insisting in the alternative that, at worst, they have a lien, as *pledgees*, on $334,208 thereof.

In answer the defendants plead the general issue and assuming the character of plaintiffs in reconvention, claim:

That the concern in liquidation owns drainage warrants amounting to $569,982, to which plaintiffs have set up a similar title, although eventually as pledgees, whereof $334,208 are presently in their possession.

That the plaintiffs are indebted unto the late corporation in the sum of $350,000 with interest, being the price of the 3500 shares of its stock, subscribed for by them and still unpaid.

That the plaintiffs are further indebted unto the company in $78,712 50, as the balance due under the letter of credit issued by them to the bank.

As defendants in reconvention, plaintiffs excepted and denying those claims, pleaded estoppel and prescription.

From a judgment allowing them less than they claimed, and the defendants more than they asked, the plaintiffs appeal.

The record in this case is unnecessarily voluminous, onerously encumbered with a mass of entirely irrelevant testimony and documentary evidence. Its imposing appearance and the representations of counsel as to the gravity of the controversy, exacted the toleration of an oral argument, which consumed four days of public time. Twelve elaborate briefs covering hundreds of pages of printed matter have been besides submitted.

It cannot be expected that the Court will state at any great length, all the facts from which the parties claim that the differences arisen between them have grown out.

In order to be intelligible, the statement would have to be chronological and methodical, and this is an impossibility. The facts advanced by each side are discordant, incongruous and irreconcilable. Such statements would necessarily embrace extraneous and cumbersome matters, the consideration of which would unavoidably confuse the mind and lead it astray.

It will suffice that the salient facts upon which the claims and counter claims are based be stated, as each matter in controversy is taken up.

There are four questions to be considered :

*First*—The money claims of plaintiffs.

*Second*—Their title to the warrants, viz : whether they are owners or pledgees and to what extent.

*Third*—Their liability for the price or value of the 3500 shares.

*Fourth*—Their liability for the balance not drawn under the letter of credit.

Those questions will be dealt with and decided in that order.

I.

The evidence indisputably establishes that the plaintiffs have deposited with the bank $50,000, for which two certificates were delivered them and on which partial payments have been made.

It also shows that the plaintiffs advanced £20,000 to the bank and issued to it a letter of credit conferring authority to draw £20,000 on them, with certain qualifications.

There can be no real dispute as to the validity of the claim for the several items aggregating $167,510, save as to the balance due on the certificates of deposit, and as to the rate of interest due on it.

After allowing credit for partial payments, that balance appears to be $41.714 77.

In the absence of any written evidence, showing an agreement to pay conventional interest, the plaintiffs can recover legal interest only on that balance and this from judicial demand.

The rest of plaintiffs' money claim is for a sum of $100,000. and a further sum of $220,250 advanced under the letter of credit.

The plaintiffs insist that the payment of these amounts is secured, at least, by a pledge of two sets of drainage warrants in their possession; the one of the face value of $214,208, the other of $120,000.

They go further, and claim to be the owners of those identical warrants and of another set of $182,000, which, they say, after being pledged, were diverted and used for the purposes and benefit of the bank.

The plaintiffs further set forth, that after $302,000 of those warrants had been thus pledged, they acquired them in full ownership for a valuable consideration.

They conclude by charging that, if they be not the *owners* they are at least the *pledgees* of all the warrants, which must be subjected by sale to the payment of their entire money demand.

On the other hand, the defendants contend that the $302,000 of warrants in question never were the property of plaintiffs; that they always belonged to the bank, together with other warrants amounting to $18,000, swelling the amount to $320,000; that Palmer, from whom plaintiffs claim to have acquired title of ownership, never owned them.

They further charge that, if the plaintiffs ever had a right of pledge on the two sets of $214,208 80 and $120,000, they have forfeited the same, and have therefore no shadow of any claim, either as owners or as pledgees, to any of the warrants mentioned in their petition; that the same are the exclusive property of the bank, and that plaintiffs should be condemned to return those in their possession free from any encumbrance whatever.

This conflict of claims brings us to consider the validity of the respective pretensions of the litigants to the warrants in question.

### II.

The evidence is clear that, at the date of the letter of credit, the plaintiffs had already advanced to the bank £20,000, or $100,000, and that on their agreeing to make further advances, under certain stipulated terms and qualifications, the bank actually pledged to plaintiffs the set of $214,208, which was physically delivered. All the other warrants owned by the bank, whether in its possession or not, were

likewise pledged, though not delivered, with the obligation on the part of the bank of redeeming them and turning them over as soon as disencumbered.

If it be true that the set of $120,000 was the property of the bank at the date of the letter of credit and of the resolution accepting the same, there is no room for doubt that, like the set of $214,208, they are affected with a lien in favor of the plaintiffs to secure the reimbursement, if not of the balance due on the certificates of deposit, at least of the advances prior and subsequent to the letter, not exceeding twice £20,000, or $200,000.

The resolution of the board accepting the letter of credit, and the receipt given for the warrants pledged, are conclusive of the fact and of the right of pledge.

The testimony and documentary proof offered by the plaintiffs do not establish that the warrants in their possession were pledged to secure the balance due on the certificates of deposit, and still less that they have become their property by any transfer from Palmer or the bank.

When they dealt with that person they knew they were treating with one occupying a double capacity and they should have required from him irrefragible title to the warrants, whether they were held by him individually or officially as president of the bank.

But he does not appear ever to have owned them. They were delivered to him by Van Norden, his debtor, to raise the encumbrance which the latter had placed on his rights of property in and to the drainage contract, which he was to transfer to the city free from any and all claim. The transfer or delivery of those warrants by Van Norden appears to have been designed and effected merely to secure the payment of the debt due Palmer.

When subsequently transferred to the bank, they passed in settlement of the indebtedness of Van Norden *cum onere*, burdened with Palmer's individual claim. So that Van Norden did not transfer, and Palmer did not acquire from him, the ownership. Hence, the latter could not and did not convey any such title to plaintiffs. Claiming to be the pledgees of the bank, plaintiffs cannot deny the latter's title, for that would be repudiating their own.

Although plaintiffs have failed to prove ownership, they have clearly established that their demand for the $122,025 is secured by privilege, unless it be true, as is urged by the defense, that by their failure to make further advances for $78,712 under the letter of credit, they have forfeited all their rights as pledgees over those warrants—a question

which is now pretermitted, but will be considered in its proper place in the latter part of this opinion.

### III.

The defendants claim from plaintiffs $350,000, as the amount due by them for 3500 shares of the stock of the company, subscribed for by them by their authorized agent, E. C. Palmer.

They aver that the subscription price of those shares was not paid in cash or in its equivalent, but in the check of Palmer for the amount, against a credit of $405,000 figuring in his favor on the books of the bank as a real debt.

The evidence does not show that the plaintiffs ever intended to buy themselves any stock from the bank, or ever authorized Palmer or any one else to purchase any stock for their benefit and account, and to pay their par value in cash or to bind them to such payment.

Consent, express or implied, was an essential prerequisite for the recovery of the price of purchase. Failure to establish it is fatal.

It appears that there was an understanding between Palmer and the bank for the conversion of $350,000 of the amount to his credit into the 3500 shares, and that this agreement was carried out by a funding of debt into stock, with the sanction of plaintiffs, whom Palmer considered as having some title to the credit standing in his name, as his creditors for a large amount.

It is not at all probable that the plaintiffs ever gave such power to Palmer, for they well knew of the tottering condition of the bank, and that taking such stock, for which no offer had been made by outsiders and which was of very little value, was not only forfeiting the preference enjoyed by creditors over stockholders, but actually to throw away to no useful purpose the amount of subscription. Such a transaction would have implied insanity.

If it were true, however, that plaintiffs did give the authority to *acquire*, there is nothing to show that they agreed to buy or pay cash for the stock.

The understanding was, explicitly, that the credit of $405,000 would be debited with the $350,000, and that the stock would thus then rest.

It may well be, as claimed, that under the circumstances surrounding it such a transaction was *ultra vires*, one not susceptible of ratification, and one therefore which is an absolute nullity, not binding on the creditors.

If such were the case the entire transaction would be irrevocably void, and neither the bank nor the stockholders could enforce it.

How then can the representatives of the bank be heard to demand specific performance of a contract which they have not proved?

The conditions upon which the contract was founded would have to be expunged and replaced by others essentially different, which never entered into the minds of the parties at the time.

The contract was to give stock for credit, or credit for stock, and the Court is asked to say that the stock was given for money, or that money was to be given for the stock.

The Court cannot substitute to the contract made one which the parties never contemplated to enter into, and lend its aid to enforce it.

The plaintiffs, whom the defendants regard as the owners of the credit in favor of Palmer, had no interest, no benefit to derive by a conversion of the debt into stock, for by so doing the preference which a creditor has over a stockholder was to be irretrievably foregone.

It may, however, be surmised that the only good which plaintiffs expected to derive by the transaction was to put part of their claim against the bank, which the latter could not honor, in the shape of stock, might have been more available and more easily disposed of in the market, the proceeds to extinguish partly Palmer's debt to them ; but if this were so, it would be a *non sequitur* to say that therefore plaintiffs are liable for the price which Palmer or they, had they *purchased*, might have then had to pay for the stock *bought*.

The inference, under the circumstances, that the bank, or its liquidators, has any right of action against plaintiffs for the price of the shares, is utterly unjustified.

This view of the case relieves us from the necessity of considering the plea of prescription which the plaintiffs have opposed to the claim of defendants, which they treat as being substantially an action of nullity of the transaction.

This demand of the reconvenors for the price of the stock must therefore be rejected.

### IV.

The letter of credit to advance £20,000 more, which was accepted by the bank, was not an absolute obligation. On the contrary, it was a conditional one. The letter and the resolution of the board show that the advances would be made only to *restore* and *maintain* the bank in an emergency or financial panic, and this at the instance of a specially convened board. It rested on the contingent saving necessities of the moment and the entire good faith of the parties.

The evidence shows conclusively that at that time the tottering condition of the bank was such to the knowledge of her managers, that the balance which otherwise might have been drawn could, under no plausible hypothesis, have *restored* and *maintained* the bank.

There was then no *special* emergency or financial panic which could authorize the board to demand the balance.

It clearly appears from the showing of the defendants themselves, that the bank was a still-born institution; that it continued to be thoroughly insolvent, and that at the date of the call it was so beyond the possibility of redemption.

Had not the plaintiffs countermanded the letter of credit, and had they paid what might have been drawn for under it, this payment would have benefited, as designed, neither the bank as an institution, nor the mass of the depositors and creditors and the stockholders, for it is manifest that it could not have saved the bank from impending collapse.

The plaintiffs were therefore right to have refused making further advance. To have acted differently would have been a piece of unqualified stultification.

Such refusal does not assuredly impair their rights as pledgees on the two sets of warrants in their possession and already mentioned. Such rights are therefore recognized, and remain in their integrity.

For these reasons:

It is ordered and decreed that the judgment appealed from be affirmed so far as it allows plaintiffs $41,714 77, with legal interest from judicial demand; that the said judgment be so amended as to allow, instead of $121,287 50, the sum of $122,205, with legal interest as claimed, and that in all other respects it be reversed;

And proceeding to render such judgment as ought to have been rendered,

It is now ordered, adjudged and decreed, that said sum of $122,205 and interest be declared to be secured by lien and privilege on the drainage warrants in the possession of plaintiffs, of the sum of $334,-208 80, which shall be sold to meet said claim, which shall be satisfied by privilege and preference over all others out of the proceeds; that the pretensions of plaintiffs to the ownership of said other warrants described in their petition be rejected, and that said warrants be declared to be the property of the defendants.

It is further ordered and adjudged, that the claims of the defendants as plaintiffs in reconvention for $350,000 and for $78,712 50, be rejected, with judgment in favor of plaintiffs as defendants in reconvention.

It is further ordered and decreed, that the defendants and reconvenors pay the costs in both courts.

## On Application for Rehearing.

MANNING, J. The single feature in the opinion attacked in the application for rehearing is that denying the defendants' demand of $350,000, alleged to be owing by the plaintiffs for 3500 shares of the capital stock of the bank. The defendants allege that this stock was subscribed for by order of the plaintiffs, to be put in the name of Palmer, their agent, and was transferred by their instructions to these persons, Jackson 200 shares, Conery 200, Keller 100, Wing 100, Musgrave 2500, and 400 shares were left in Palmer's name. Musgrave's shares were afterwards transferred to Louis Crossley and Edward Crossley for Jno. Crossley & Sons—that on July 1, 1874, Palmer drew a cheque on the bank for $350,000 in payment of this stock, and this cheque has never been paid—that the bank was then insolvent to the knowledge of Palmer and the plaintiffs, and that the latter are therefore responsible for the stock and owe the bank $350,000.

The plaintiffs say this stock was not subscribed for by them nor by Palmer for them, but for himself, and to carry out his own plans and purposes, and after he had so acquired this stock, the plaintiffs bought 2500 shares of him in good faith, in due course of business and upon Palmer's representation that he was the owner of it and that it was full paid stock.

The whole argument of the defendants in controversion of this position of the plaintiffs is that it is in conflict with the allegations of the plaintiffs' answers to their demand in reconvention, and that these answers are inconsistent each with the other, and that the plaintiffs are bound by their judicial admissions. Then assuming that the fact of subscription by the Crossleys is proved, or rather admitted, they insist that the law is that the liquidators of the bank can enforce rights and claims that the bank could not, because they represent creditors of the bank.

Upon the question of fact, the Crossleys in one of their answers allege their purchase of the stock from Palmer in good faith and for a valuable consideration, and on his representation that it was fully paid for and he was the owner of it, and deny explicitly any subscription therefor, but this is said to be inconsistent with and contrary to their allegation in their supplemental answer, that the stock was not paid for. There is no inconsistency. In their answer in chief, they allege that Palmer represented it as full paid, and in the supplement that it was not in fact full paid, and both allegations are true.

The bank owed Palmer over $400,000 in June, 1874, and he owed the Crossleys. They had deposited with the bank, at Palmer's instance,

$50,000, and afterwards advanced $100,000 to it, and gave it a letter of credit for $100,000 additional, of which only something over $20,000 was used. The directors issued additional stock and it was agreed that Palmer's credit at the bank, or $350,000 of it, should be converted into this stock in Palmer's name, and it was done. Afterwards the Crossleys bought of Palmer 2500 of these shares. The bank paid Palmer its debt to him or the largest part of it with this stock, and he sold 2500 shares of it and extinguished his debt to the Crossleys *pro tanto*. The resolution of the directors explicitly states what was to be done and it was done, as was thus stated. It would have been insanity, as the opinion says, for the Crossleys to have acted otherwise. They had tried and were trying to prop up the bank and were assured by its president they could do it successfully. They lost money in the effort and it failed. Of all those who were deluded by the misrepresentations of the bank president of its condition, none suffered so disastrously as the Crossleys.

Upon the question of law the liquidators cannot enforce an obligation when none exists. Unless the Crossleys did the acts that are charged to have created the obligation, or made judicial admissions that bind them to the consequences of such admissions, they cannot be held liable as charged, and a review of the opinion of the Court and comparison of it with the evidence in the record shews that it rightly refused judgment against the Crossleys as the defendants demand.

The rehearing is refused.